## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>v.<br><br>GUILLERMO LOPEZ-CASILLAS,<br><br>               Defendant. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**<br><br>Case No. 2:15-cr-00488-JNP-DBP-1<br><br>District Judge Jill N. Parrish |

Before the court is Defendant Guillermo Lopez-Casillas' motion to suppress evidence obtained from a search of his car after a traffic stop. (Docket No. 32). The court held an evidentiary hearing on the matter on January 4, 2017. (Docket No. 51). The transcript of that hearing was filed on January 12, 2017. (Docket No. 53). Defendant submitted a memorandum in support of the motion on February 22, 2017. (Docket No. 58). The government responded with its own memorandum in opposition on March 8, 2017. (Docket No. 59). Defendant did not file a reply. Both parties filed proposed findings of fact and conclusions of law for the court's consideration. (Docket Nos. 60, 61). The court held oral argument on the matter on April 4, 2017. As explained below, the court DENIES Defendant's motion.

## FINDINGS OF FACT

### I. The initial traffic stop.

At around 10:00 AM on August 14, 2015, Trooper Jared Withers of the Utah Highway Patrol was parked on the median of Interstate 70 ("I-70") near milepost 140 and about twenty miles west of Green River, Utah. (Tr. 11:14-19). Trooper Withers was monitoring the speed of

passing motorists with radar. (Tr. 11: 18-19). At 10:18 AM, he noticed a darkly colored BMW car approaching. (Tr. 12:3-4). He clocked the car travelling at sixty-five miles per hour despite the posted speed limit of sixty. (Tr. 11:25; 12:5). As the car approached Trooper Withers' position, it slowed to fifty-five miles per hour. (Tr. 12:5-7).

As the car drew closer, Trooper Withers observed a dark strip of window tint running along the top of the windshield and extending below the AS-1 line,[1] which he knew to be a violation of Utah law. (Tr. 12:8-10; 21:24 – 22:3). He also noted that the car's side windows were so darkly tinted as to prevent him from seeing inside the passenger compartment. (Tr. 12:8-13). Having previously tested the light transmittance of "a couple thousand windows," Trooper Withers concluded this was also "an obvious violation" of Utah law. (Tr. 23:15-20). Accordingly, Trooper Withers left the median, pulled up behind the car, and initiated a traffic stop. (Tr. 12:18-24). As the car was slowing to a stop near milepost 141, Trooper Withers observed that tinting on the rear windshield covered the center brake light—another violation of Utah law. (Tr. 12:21-23). At some point, Trooper Withers noted that the vehicle had a temporary license plate taped to the front windshield. (Tr. 24:6-9).

## II.      Initial discussion with the car's occupants.

Trooper Withers approached the vehicle on the passenger side. An adolescent passenger rolled down the passenger-side window as Trooper Withers approached. (Tr. 25:11-17). Trooper Withers leaned over, rested his arms on the passenger's door, and began to speak to Defendant, who was in the driver's seat. (Tr. 25:20-21; Gov. Exh. 1 at 10:18:15-21). Trooper Withers then informed Defendant that his vehicle's window tint violated Utah law, briefly leaned his head and inserted his arm into the passenger compartment, and pointed to the tint extending below the AS-

---

[1] According to Trooper Withers, the "AS-1" line is a small manufacturer's mark on the windshield that indicates the legal limit for windshield tinting. Tinting that extends below the AS-1 line is illegal in Utah. (Tr. 18:15-20).

1 line. (*See* Tr. 25:11-17; Gov. Exh. 1 at 10:18:36-47). Defendant responded that the back windows were tinted when he bought the car, but the side windows and the front windshield were not. (Tr. 25:14-17). Trooper Withers then asked Defendant where he was from and whether he had a driver's license. Defendant responded that he was from Los Angeles, California, and admitted that his driver's license was currently suspended due to a 2008 DUI conviction. (Tr. 25:25 – 26:1; 26:5-8). Thus, neither Defendant nor his fifteen-year-old passenger was authorized to drive the car. (Tr. 26:9-18).

As Defendant searched for his identification, Trooper Withers asked him where he and his passenger were headed. (Tr. 26:22). Defendant responded that he was taking the passenger back to Minnesota. (Tr. 26:13; 26:23 – 27:2). Defendant initially identified the passenger as his cousin, before saying the passenger was in fact his cousin's son. (Tr. 26:24 – 27:2). Trooper Withers noted that the passenger was "showing extreme physical signs of nervousness"—he observed sweat forming on the passenger's forehead and the "carotid artery in his neck [was] pounding."  (Tr. 27:4-7).

Defendant eventually provided an identification card issued by the State of California that identified him as Guillermo Lopez-Casillas. (Tr. 27:20-23).  After Defendant handed him the card, Trooper Withers requested registration and insurance information for the car. (Tr. 27:24-25). Defendant produced an insurance card and indicated that the only registration he had on hand was a temporary permit taped to the windshield. (Tr. 28:1-5). The insurance had an effective date of August 8, 2015, while the registration was issued in Minnesota on August 7, 2015. (Tr. 28:2; 28:6-11).

As he gathered the requested documentation, Defendant explained to Trooper Withers that he had already driven to California and was heading back to Minnesota after less than a

week. This quick turnaround from California, coupled with purchase of the vehicle only seven days prior in Minnesota, piqued Trooper Withers' suspicion. Trooper Withers estimated that the distance between Minnesota and Los Angeles was around 2,000 miles—a trip that would require ten to twelve hours of driving over three days. (Tr. 28:17-24; 29:1-3). Trooper Withers also noticed a hat with a Ferrari symbol on the passenger's seat, which he identified as a common signifier "specifically used by Mexican drug organizations as a symbol to represent themselves." (Tr.29:7-9, 11-12).

At that point, Trooper Withers asked Defendant to accompany him to his patrol car while he ran Defendant's information. Defendant agreed and exited his vehicle. (Tr. 29:20 – 30:7). Trooper Withers observed that Defendant was wearing dress slacks, dress shoes, a button-up shirt, and "a nice hat," which Trooper Withers considered unusually formal for a cross-country traveler. (Tr. 30:10-14). Defendant explained that this was "just how he likes to dress" and nothing more than a reflection of "his [sense of] style." (Tr. 33:2-3).

### III.     Discussion with defendant in the patrol car.

When they reached the patrol car, Trooper Withers conducted a brief consensual search for weapons on Defendant's person. He then allowed Defendant to sit in the front passenger seat of the patrol car. (Tr. 30:16-25). As Trooper Withers filled out a citation on his laptop, Defendant explained that he had moved from California to Minnesota three months prior and was in the process of making the move permanent. (Tr. 31:4-11). He told Trooper Withers that he stayed with the passenger's mother while in Minnesota. He also indicated that he worked installing radios and electronics for the passenger's mother. (Tr. 31:10-15). Defendant told Trooper Withers that he had been in California for "about a week" before Trooper Withers reminded him that it was only a week before that he had purchased the car in Minnesota. (Tr. 35:5-7). At this,

Defendant amended his answer, saying that they had been in California for five days. (Tr. 35:9). As they talked, Trooper Withers observed that Defendant's breathing became heavy. (Tr. 33:3-5).

At approximately 10:23AM, around five minutes after he initiated the stop, Trooper Withers contacted dispatch and asked them to run a driver's license check, a warrants and criminal history check, and a check of the VIN and registration for Defendant's car. (Tr. 33:9-16). Trooper Withers then asked Defendant "what [they] should do" to resolve the stop since neither Defendant nor his passenger were permitted to drive. They discussed whether Defendant knew anyone in the area. (Tr. 33: 21 – 34:1; 33:21 – 34:3). Defendant responded that he did not know what to do because his closest relative lived in Arizona. (Tr. 34:3-4).

### IV. Further investigation.

At this point, Trooper Withers suspected that Defendant might be transporting narcotics. Thus, Trooper Withers deployed his K-9, Marco, while waiting for the requested information from dispatch. (Tr. 34:5-7). Marco made three passes on the vehicle but did not alert to the odor of narcotics. (Tr. 34:15-16). After he put Marco back into the patrol car, Trooper Withers retrieved the window tint meter to check the light transmittance on the side windows of Defendant's car. (Tr. 34:18-20). While testing the windows, Trooper Withers spoke to the passenger about the trip to Minnesota. (Tr. 34:23-25; 35:10-17). Contrary to the statements that Trooper Withers had elicited from Defendant just moments before, the passenger indicated that they had only been in California for about two days, and had left Minnesota just four days prior. (Tr. 35:16-19). As he questioned the passenger, Trooper Withers again observed signs of significant anxiety and asked the passenger why he was so nervous. (Tr. 36:12-19). The

passenger responded that the dog made him nervous, but Trooper Withers explained that he had seen signs of anxiety even before the dog was deployed. (Tr. 36:16-21).

After confirming that the window tint was not in conformance with Utah law, Trooper Withers returned to his patrol car where Defendant was waiting. (Tr. 37:2-12). Asked to confirm the length of his trip, Defendant again asserted that he had been in California for five days. (Tr. 37:14-15). Trooper Withers then asked if there was anything illegal in the vehicle, and Defendant responded that there was not. (Tr. 37:15-17). Defendant further denied that he had any "cocaine, methamphetamine, heroin, [or] marijuana" when Trooper Withers asked him about each drug directly. (Tr. 37:17-20). Despite this denial and the earlier failure of the K-9 to alert, Trooper Withers still suspected that Defendant was transporting narcotics and asked Defendant for permission to search his vehicle. Defendant nodded his head and then verbally assented to the search. (Tr. 39:18-20; 41:7). At this point, Trooper Withers was still waiting for the requested information from dispatch.

**V.        Search of the car.**

In order to safely conduct the search, Trooper Withers instructed Defendant to stand at a signpost about fifty feet ahead of Defendant's car. (Tr. 40:1-10). Defendant complied. Trooper Withers also told Defendant that he could yell from that position if he objected to any aspect of the search, but should not approach the car during the search. (Tr. 40:2-7).  Trooper Withers explained that this prevented Defendant from "com[ing] up behind" him during the search. (Tr. 40:3-10).

When he first approached the car, Trooper Withers asked the passenger if he had any luggage. (Tr. 40:14-15). The passenger indicated he had a backpack, which he allowed Trooper Withers to search. (Tr. 40:15-17). As he began to search the car, Trooper Withers asked the

passenger to stand between the post where the defendant was waiting and the car. (Tr. 40:19-20). Trooper Withers began the search of the car around 10:32AM. (Tr. 40:23-25).

The initial search of the car turned up nothing. Trooper Withers searched both the front passenger area and the driver's side, but didn't see "anything obvious." (Tr. 41:16-19). When he searched the trunk, however, he noticed "some bolts on the floor of the trunk that looked like [they] had tooling or tampering," which indicated the possible concealment of contraband beneath the trunk. (Tr. 41:20-23; 42:9-17). At around 10:37 AM, while Trooper Withers searched the trunk, dispatch finally returned information about Defendant's criminal history, which included charges of resisting arrest and an attempted murder. (Tr. 42:18-21; 43:5-8). Shortly thereafter, Trooper Withers retrieved Marco the K-9 from his patrol car and led him to the trunk, where the dog gave a "positive aggressive indication [of] drug odor on the floor of the trunk on the rear passenger side." (Tr. 42:1-3).

Trooper Withers returned Marco to the patrol car and began searching the area where the dog had indicated. (Tr. 43:18-21). In the space between the floor of the trunk and the car's bumper, he found several packages that were vacuum-sealed in plastic and wrapped in tape, as well as one larger plastic container. (Tr. 43:23-25; 44:16-17). Based on prior experience in drug interdiction, Trooper Withers concluded that some or all of these packages contained methamphetamine. (Tr. 44:17-21). Trooper Withers then placed Defendant and the passenger under arrest. (Tr. 44:23-25).

## CONCLUSIONS OF LAW

Defendant moves this court to suppress all evidence obtained by Trooper Withers as a result of the traffic stop and subsequent search of his car. Defendant first argues that Trooper Withers violated his Fourth Amendment rights by unjustifiably extending the duration of his

initial detention in order to conduct the search. He next argues that Trooper Withers violated his Fourth Amendment rights by searching his car without probable cause and argues that his consent to search was invalid. In the alternative, Defendant argues that, even if he validly consented to the search, Trooper Withers exceeded the scope of that consent. As explained below, the court rejects these arguments and denies the motion to suppress.

## I.      SCOPE AND DURATION OF THE TRAFFIC STOP

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. The protections of the Fourth Amendment extend even to routine traffic stops. *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) ("A traffic stop is a seizure within the meaning of the Fourth Amendment."). For a traffic stop to be constitutionally valid, it must either be "based on an observed traffic violation" or an officer's "reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *Id.* at 787. "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable." *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995).

Beyond investigating and issuing the traffic citation, an officer may also legally engage in "ordinary inquiries incident to [the traffic] stop." *Rodriguez v. United States*, 135 S.Ct. 1609, 1615 (2015) (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). Typically, these inquiries involve checking the driver's license, registration, and proof of insurance, as well as determining whether any outstanding warrants for the driver exist. *See id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 658–60 (1979)). The Tenth Circuit has also consistently held that officers may ask questions about a motorist's travel plans or other matters unrelated to the purposes of the stop "so long as they do not prolong the stop." *See United States*

*v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015) (citing *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001) and *United States v. Simpson*, 609 F.3d 1140, 1146 n.1 (10th Cir. 2010)).

Here, the traffic stop was supported by at least three observed or suspected violations: traveling five miles per hour over the posted speed limit, windshield tinting below the AS-1 line, and window tinting darker than Utah law allows. Accordingly, Defendant does not dispute that the initial traffic stop was justified by a reasonable, articulable suspicion of an observed or suspected traffic infraction and several equipment violations. Nor does he dispute that Trooper Withers had a particularized and objective basis for suspecting that Defendant was transporting narcotics, justifying further investigation and the use of Marco the K-9 to inspect the outside of the car. Instead, Defendant argues that Trooper Withers impermissibly extended the duration of the stop by 1) requesting that dispatch run information checks on Defendant and his car rather than using the patrol car's laptop to do so, and 2) by further questioning Defendant regarding narcotics after Marco the K-9 failed to indicate when led around the exterior of the car. The court rejects each argument as explained below.

## A. Call to Dispatch

First, Defendant argues that Trooper Withers' call to dispatch for criminal history and registration information regarding Defendant and his car unreasonably extended the duration of the stop. Defendant asserts that Trooper Withers could have more quickly resolved the stop by simply using his patrol car's laptop to look up the relevant information. The court disagrees.

The court first notes that it is not clear from the record that Trooper Withers had an available internet connection that would allow him to access the requested information. He testified that internet availability on the section of I-70 where the stop took place is "real spotty" and he was unsure whether a connection was available at the time of the stop. (Tr. 52:20 – 54:7).

But even assuming that Trooper Withers had a sufficient internet connection to conduct a records check, there is no indication here that dispatch took any longer to obtain the information than Trooper Withers would have under the circumstances. In fact, it is likely that Trooper Withers would have taken *longer* to obtain the requested information if he were required to do so while investigating both the window tint violation and suspected drug-trafficking. In any event, absent any evidence of unreasonable delay or dilatory motive, the court must conclude that it was entirely reasonable for Trooper Withers to delegate the records check task to dispatch. On this record, a contrary conclusion would amount to "unrealistic second-guessing" of police conduct in a "swiftly developing situation." *See United States v. Sharpe*, 470 U.S. 675, 686 (1985); *id.* at 686–87 ("A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some [less intrusive] means by which objectives of the police might have been accomplished. But . . . [that] does not, itself, render the search unreasonable."); *United States v. Lovelady*, No. 2:13-cr-00044-RJS, 2014 WL 2208158, at *13 (D. Utah May 28, 2014) (unpublished) ("[T]he law does not require that an officer's conduct be perfect, or perfectly efficient, during a traffic stop.").

Additionally, the court notes that neither Defendant nor his passenger was legally permitted to drive the car from the scene. Defendant's license was suspended, his passenger was not old enough to drive, and Defendant had indicated to Trooper Withers that he knew no one in the area who could take custody of the car. (*See* Tr. 33:21–34:1; 33:21–34:3). "[T]he police are not required to release a vehicle when there is no licensed driver to attend it." *United States v. Shareef*, 100 F.3d 1491, 1508 (10th Cir. 1996) (citing *United States v. Harvey*, 16 F.3d 109 (6th Cir.), *cert. denied*, 513 U.S. 900 (1994)). Thus, even after the allegedly unreasonable records

check was complete, Trooper Withers was fully justified in holding the vehicle until arrangements for impound could be made.[2]

Finally, Defendant does not dispute that Trooper Withers had an articulable, reasonable suspicion of additional criminal activity beyond the equipment violations that justified the initial stop. After an officer finishes a routine traffic stop, the officer may continue to detain an individual if "the officer has an objectively reasonable and articulable suspicion that [further] illegal activity has occurred or is occurring." *United States v. Cervine,* 347 F.3d 865, 868-69 (10th Cir. 2003) (citations and quotations omitted); *see also United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001). Here, Trooper Withers had an "objectively reasonable and articulable suspicion" of a drug crime that authorized him to extend the detention beyond the time necessary to complete the initial stop. Thus, whether or not Trooper Withers' delegation of the records check to dispatch was somehow unreasonable is ultimately irrelevant—by the time dispatch eventually provided the requested information, Trooper Withers had not yet dispelled or confirmed his admittedly reasonable suspicion that Defendant was transporting narcotics. *See United States v. White*, 584 F.3d 935, 953 (10th Cir. 2009) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of either dispelling or confirming the officer's reasonable suspicion." (internal quotations omitted)). Thus, he still had

---

[2] The court notes here that even if the entire search was unreasonable or otherwise illegal, suppression could be avoided by application of the inevitable discovery doctrine. *See Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States v. Haro-Salcedo*, 107 F.3d 769, 773 (10th Cir. 1997). As noted above, Trooper Withers was justified in impounding the vehicle in the absence of any licensed driver to attend it. It appears that a proper inventory search of the impounded vehicle would have inevitably led to the discovery of the drugs hidden below the trunk—Trooper Withers testified that the packages of drugs "weren't hidden very well" and were almost immediately visible when he crouched down beside the rear bumper. (Tr. 43:22–44:4). Though neither party raised the issue, it bolsters the court's decision to deny suppression. *See Haro-Salcedo*, 107 F.3d at 773 (denying suppression of cocaine obtained pursuant to an illegal search of a stopped vehicle where subsequent lawful impoundment and an associated inventory search would have led inevitably to the discovery of the cocaine); *United States v. Price*, No. 2:12-cr-81-TS, 2012 WL 3017707, at *4–*5 (D. Utah Jul. 23, 2012) (unpublished) (denying suppression despite possibility of illegal search because neither occupant of a stopped vehicle could drive and discovery of the evidence was inevitable during an inventory search after impound).

legal authority to detain Defendant even after the allegedly unreasonable records check was complete.

### B. Additional Questioning after K-9 Sniff

Still, Defendant argues that Trooper Withers' suspicions of drug trafficking should have been dispelled by Marco's failure to alert to the presence of narcotics after several passes around the exterior of the car. Defendant insists that the failure to alert vitiated any reasonable suspicion that may have existed and, as a result, Trooper Withers impermissibly extended the duration of the stop by further questioning Defendant regarding narcotics and asking to search his vehicle. Again, this court disagrees.

In a closely analogous context, the Tenth Circuit has held that investigators need not "cease an otherwise reasonable investigation solely because a dog fails to alert." *See United States v. Ramirez*, 342 F.3d 1210, 1213 (10th Cir. 2003); *United States v. Glover*, 104 F.3d 1570, 1577 (10th Cir. 1997), *abrogated on other grounds by Corley v. United States*, 556 U.S. 303 (2009). Indeed, "even highly trained dogs remain fallible" because their senses can be thwarted by unideal conditions, masking scents, or even the dog's mood. *See id.* at 1213 & 1213 n.2 (suggesting that a trained narcotics detector dog could have been thrown off by the smell of "grease and coffee grounds" or "because she was having a bad day"). Here, Trooper Withers indicated that proper packaging can also conceal narcotics from an investigatory sniff. (Tr. 75:19-20 ("When drugs are packaged properly, it's very easy to beat the K-9.")); *see also Glover*, 104 F.3d at 1577 n.3 (indicating that narcotics may not be detectable by sniff where the amount of narcotics is small or "the drug is double packaged with plastic"). Thus, the fact that Marco failed to alert when led around the exterior of the car did not in any way undermine Trooper Wither's otherwise reasonable suspicion that the car contained narcotics. *See Ramirez*, 342 F.3d

at 1212 ("The factors giving rise to reasonable suspicion in the first place remained unchanged by the positive or negative results of the . . . sniff test."). Trooper Withers was therefore entitled to ask Defendant additional questions regarding narcotics and to request permission to search Defendant's vehicle.

Based on the foregoing, the court concludes that the stop was reasonable in both scope and duration and rejects Defendant's contrary arguments.

## II.     DEFENDANT'S CONSENT TO SEARCH

Defendant next argues that Trooper Withers' search of his car was unlawful because his consent to the search was not voluntary. As explained below, the court disagrees.

"An officer may conduct a warrantless search of a vehicle without violating the Fourth Amendment if the person in control of the vehicle voluntarily consents to the search." *United States v. Taverna*, 348 F.3d 873, 878 (10th Cir. 2003) (citing *Zubia-Melendez*, 263 F.3d at 1162); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). To demonstrate that consent to search was voluntary, the government must "'proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given,'" and further demonstrate that the searching officer "used no 'implied or express duress or coercion'" to obtain consent. *United States v. Sanchez*, 608 F.3d 685, 690 (10th Cir. 2010) (quoting *Taverna*, 348 F.3d at 878).

In this case, Trooper Withers provided clear testimony that when he asked Defendant for consent to search the car, Defendant both nodded his head affirmatively and said "yes." (Tr. 39:18-20).  Thus, Defendant unequivocally and specifically granted permission to search his car and the only issues before the court are the validity and scope of that consent.

### A.  Validity of Defendant's Consent to Search

Consent is only valid when it is "freely and voluntarily given." *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998) (internal quotations omitted) (quoting *Schneckloth*, 412 U.S. at 219). Thus, the "central question in determining whether consent to search is voluntary is 'whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's request.'" *United States v. Contreras*, 506 F.3d 1031, 1037 (10th Cir. 2007) (alterations omitted) (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)). "Whether a party has voluntarily consented to a search is a question of fact that the district court must evaluate in view of the totality of the circumstances." *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000); *see also Sanchez*, 608 F.3d at 689. Factors that may inform the voluntariness of consent include: (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and a tone of voice that is not insisting;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as the shoulder of an interstate highway, in public view;" and (v) the "officer's failure to advise the defendant that [he or] she is free to leave." *United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (internal quotations omitted). Other important factors include: (vi) the display of a weapon and (vii) coercive physical contact by the officer. *See United States v. Soto*, 988 F.2d 1548, 1557–58 (10th Cir. 1993) (reasoning that consent was voluntary where the requesting officer "did not unholster his weapon" and "did not physically harass [the] defendant"). Courts may also consider whether the defendant was detained when consent was given, though "detention is only one factor to be considered in determining whether consent was voluntarily

and freely given" and is not necessarily dispositive of voluntariness. *Contreras*, 506 F.3d at 1037. No one factor is dispositive and "a court must consider all the circumstances surrounding the encounter to determine whether consent was voluntary." *Ledesma*, 447 F.3d at 1314 (internal quotations omitted) (quoting *Bostick*, 501 U.S. at 439).

In evaluating these factors, the court concludes that Defendant's consent to search his car was voluntary. The court notes that the stop occurred on the side of a public highway in plain view of other motorists. Trooper Withers was alone and did not act in a threatening manner, or otherwise bully or pressure Defendant. He never displayed his weapon and only made physical contact with Defendant during the brief pat-down search after Defendant agreed to accompany him to the patrol car. Defendant was then allowed to sit in the front seat of the patrol car next to Trooper Withers while they discussed the citation and Defendant's travel plans. They also discussed how to resolve the traffic stop given the fact that neither Defendant nor his passenger could legally drive, suggesting that Defendant had at least some say in the resolution of the stop. Further, Trooper Wither's tone did not suggest that his request to search Defendant's car was compulsory.[3] In fact, his demeanor and tone were relatively pleasant and conversational throughout the encounter, including when he discussed searching Defendant's car. *See generally* Gov. Exh. 1. And Defendant granted permission to search the car without any apparent hesitation, immediately nodding and then responding "yes" after Trooper Wither's request. *See Zubia-Melendez*, 263 F.3d at 1163 (holding that consent was voluntary where, despite an initial refusal, the defendant eventually consented "without hesitation when . . . asked a second time").

---

[3] Defendant suggested at oral argument that the fact that the request for consent came immediately after a series of direct questions regarding specific drugs indicated an "aggressive" tone. Upon review of the "dashcam" video, the court cannot agree that the questioning and the request for consent were in any way "aggressive" or otherwise coercive in tone. *See United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) (rejecting argument that consent was involuntary where defendant was detained, officer retained defendant's effects, and officer "asked to search the car immediately after asking whether [defendant] carried contraband or firearms in the car and reciev[ed] a negative answer").

Finally, Trooper Withers explicitly announced that Defendant could object to "anything that [Trooper Withers] was doing" during the search and instructed Defendant to yell to get his attention if he did in fact object, giving Defendant an extensive measure of control over the search. (Tr. 40:2-7); *see also Bostick*, 501 U.S. at 432 (indicating that the fact that "police specifically advised [defendant] that he had the right to refuse consent" was "particularly worth noting" in consent analysis); *United States v. Ward*, 961 F.2d 1526, 1533 (10th Cir. 1992), *overruled on other grounds by United States v. Little*, 18 F.3d 1499, 1504 (10th Cir. 1994), ("Whether an individual is advised of his . . . rights is important, particularly because [such] warnings . . . 'show the individual that police are prepared to recognize his choice to assert his constitutional rights.'"). Based on these factors, the court concludes that Defendant's consent was freely and voluntarily given.

### B. Trooper Withers' Body Language

Defendant protests that, while Trooper Withers' demeanor may have *seemed* pleasant, his body language was intimidating and ultimately coercive. Defendant asserts that, when he first approached the car, Trooper Withers leaned on the passenger-side door, "resting his arms on the passenger's door and sticking his head" into the passenger compartment. (Docket No. 58, at 13). Defendant then cites to *United States v. McSwain*, 29 F.3d 558, 562–63 (10th Cir. 1994), for the proposition that an officer "leaning over and resting his arms on the driver's door when he asked for consent to search" may be an indication of unintentional coercion by the officer, *see id.* at 563, and suggests that Trooper Withers' body language was coercive.[4] The court rejects this line of argument.

---

[4] Defendant actually cites to *United States v. Ramos*, 194 F. Supp. 3d 1134, 1179 (D.N.M. 2016) for this proposition, but that case only supports the proposition insofar as it cites to *McSwain*. Accordingly, the court assumes that Defendant's argument was meant to rely on *McSwain*.

As an initial matter, review of the "dashcam" video of the encounter does not support the assertion that the positioning of Trooper Withers' arms on the car was aggressive or coercive. Instead, this conduct appears to be nothing more than an adjustment in posture that allowed Trooper Withers to actually see and speak to Defendant from the passenger window. *See West*, 219 F.3d at 1177 (rejecting argument that officer took "a controlling and aggressive posture by standing extremely close to [the defendant's] car and leaning forward" toward the door, reasoning that there was no indication of coercion or aggression and the officer "likely stood relatively close to the vehicle to avoid being hit by traffic"). Trooper Wither's momentary physical entry into the passenger compartment appears similarly non-coercive—it lasted only a few seconds and was entirely limited to pointing out the AS-1 line in order to explain the basis of the stop. Moreover, Trooper Withers' tone during this portion of the encounter was entirely conversational, with no discernible hint of aggression or threat.

The court also rejects Defendant's appeal to *McSwain*. The *McSwain* court evaluated the voluntariness of consent to search in the context of an illegal detention, concluding that defendant's consent to search could not "purge the taint of [the] illegal detention" because "several elements suggesting lack of voluntariness were present." *McSwain*, 29 F.3d at 562–63. Among these elements, the court noted that the officer leaned over and rested his arms on the driver's door as he asked the driver for consent to search. *Id.* at 563. Though Trooper Withers' conduct here bears some superficial similarity to the police conduct that was found to be unintentionally coercive in *McSwain*, the case is nevertheless easily distinguishable. Here, Trooper Withers leaned on the passenger door, not the driver's door as in *McSwain*, meaning Trooper Withers was not in close physical proximity to Defendant. This minimized or eliminated any potential imposition or intimidation resulting from Trooper Withers' conduct. More

fundamentally, the coercive conduct at issue in *McSwain* occurred *as the officer asked for consent to search. See id.* at 563. By contrast, the supposedly coercive conduct that Defendant relies on here occurred well before Trooper Withers asked for consent to search Defendant's car. The court cannot conclude that the fact that Trooper Withers leaned over, rested his arms on the passenger door, and briefly leaned his head or arm into the passenger compartment was somehow so physically intimidating that it would coerce a reasonable person to allow a vehicle search several minutes after the fact.[5] *See Ramos*, 194 F. Supp. 3d at 1180–81 (analyzing coercion in the context of a vehicle search under a reasonable person standard).

### C. Effect of Legal Detention on Defendant's Consent

Defendant also faults Trooper Withers for not returning his ID and other effects and insists that he could not actually leave the area because neither he nor his passenger could legally drive, indicating that he was detained and otherwise unable to walk away from the encounter. While factually accurate, these arguments miss the point. The court has already concluded that Defendant was lawfully detained at the time that Trooper Withers asked to search his car and therefore could not lawfully leave the area. But "detention is only one factor to be considered in determining whether consent was voluntarily and freely given based on the totality of the circumstances." *Contreras*, 506 F.3d at 1037. And, although Defendant was technically detained while Trooper Withers conducted a lawful investigation, the circumstances of his detention do not indicate that his consent was coerced. Beyond the factors discussed above, the court notes that Defendant was not handcuffed or otherwise restrained. He was not placed in the rear of the

_____

[5] Further, *McSwain* dealt with the voluntariness of a search in the context of an *illegal* detention, which augments the burden on the government to prove that consent was given voluntarily. *See id.* at 562; *McRae*, 81 F.3d at 1537. The court has already held that the detention here was legal, making the heavier burden in *McSwain* inapplicable. Thus, even if the court were to count this conduct against Trooper Withers, it would not have nearly as much effect on the totality of the circumstances as the ostensibly coercive conduct in *McSwain*.

patrol car against his will, but sat in the front seat alongside Trooper Withers after consenting to accompany Trooper Withers there. Most crucially, Trooper Withers expressly told Defendant he could verbally object to "anything that [Trooper Withers] was doing" during the search. (Tr. 40:2-7).  Even when weighed against the fact that he was legally detained, Defendant's express opportunity to limit or otherwise terminate the search tips decisively against a finding of coercion here.

### D.  Defendant's Opportunity to Revoke or Modify Consent

Defendant next argues that, even if he did validly consent to the search, he "was not given the ability, or opportunity, to withdraw or limit his consent." (Docket No. 58, at 14). Defendant asserts that he could not see what Trooper Withers was doing in the trunk, let alone object to it, because he was instructed to stand approximately fifty feet from the car and not to approach Trooper Withers during the search. Defendant seems to argue that these instructions were an improper "bait-and-switch" that somehow undid his prior consent or exceeded its scope. The court rejects this argument as both legally and factually infirm.

As an initial matter, an officer is entitled to conduct a consensual search in a safe manner. *United States v. Harmon*, 785 F. Supp. 2d 1146, 1174 (D.N.M. 2011) (officer was entitled to conduct pat-down on defendant and have him "walk a little ways" from the car during consensual search of defendant's car); *United States v. Manjarrez*, 348 F.3d 881, 887–88 (10th Cir. 2003) (officer was entitled to perform a pat-down of defendant who had voluntarily consented to a search of his car). Here, Trooper Withers, "unassisted at the time, could not reasonably be expected to leave Defendant in his patrol car, turn his back on Defendant, insert his head into Defendant's car, and search the car without first" taking appropriate precautions.

*See Manjarrez*, 348 F.3d at 887. Thus, Trooper Withers was entitled to take reasonable steps to mitigate potential danger while he conducted the search.[6]

Additionally, if Defendant felt that standing near the milepost during the search was unacceptable, he could have objected as soon as Trooper Withers instructed him to move to the milepost. Or, if Defendant found that he was unable to monitor the search to his satisfaction from his position near the milepost, he could have revoked or otherwise modified his consent at any time by calling out to Trooper Withers. *See Harmon*, 785 F. Supp. 2d at 1174 ("Although [the officer] asked [the defendant] to walk a little ways from the vehicle so that he could conduct the search in a safe manner, . . . [the defendant] was free to call out to [the officer], and withdraw his consent to the search."); *United States v. Jimenez-Valenia*, 419 F. App'x 816, 820–21 (10th Cir. 2011) (unpublished) (holding that defendant was not coerced or otherwise deprived of opportunity to withdraw consent when "asked to stand one hundred feet away" from the car while it was searched and told to yell out if he needed to speak to the officer during the search). Thus, the court cannot conclude that the restrictions on Defendant's conduct during the search were somehow coercive or otherwise exceeded the scope of consent.

More importantly, the record simply does not support Defendant's assertion that his ability to object was limited by his vantage point fifty feet from the car. First, the court is not convinced that Defendant could not properly see the search as it progressed. The search occurred in broad daylight and it does not appear from photographs taken at the scene or from the "dashcam" video that Defendant's view of the car would be obscured in any way by the terrain or some other object. While Defendant likely could not see *exactly* what Trooper Withers was

---

[6] Additionally, in the absence of contrary authority, the court is unconvinced that Trooper Withers "had some independent duty to ensure [Defendant] an opportunity to withdraw consent after the search began." *See United States v. Gallardo*, 495 F.3d 982, 990 (8th Cir. 2007). But, in any event, there is no evidence to support Defendant's contention that he had no ability or opportunity to withdraw his consent to the search once it began.

doing inside the trunk, there is no indication that he was unable see the general areas Trooper

Withers was searching. Accordingly, when Trooper Withers lifted up the trunk door or began to

search around the rear of the car, Defendant could have objected if he wished to preserve that

area from inspection. *See Gallardo*, 495 F.3d at 990 (noting in dicta that there was no indication

that defendant seated in patrol car directly behind the car being searched could not communicate

an intent to withdraw consent to search); *United States v. Lopez*, No. 07-10073-01-JTM, 2007

WL 2333242, at *5 (D. Kan. Aug. 14, 2007) (unpublished) (finding no indication that "defendant

lacked an opportunity to withdraw his consent" even though he was not within "direct line of

sight" to the area being searched).

The record also controverts Defendant's claim that the noise of passing traffic would

have drowned out any attempt to object to the search as it progressed. Review of the "dashcam"

video indicates that the noise from passing traffic was sporadic and not overwhelmingly loud. In

fact, after he found the packages underneath the trunk, Trooper Withers was fully able to get

Defendant's attention from the same distance by calling out to him, even as several cars passed

in succession. Thus, there is no indication that ambient noise deprived Defendant of an

opportunity to object—at most it would have made getting Trooper Withers' attention only

slightly more difficult.

### E. Scope of the Search

Finally, insofar as Defendant contends that Trooper Withers' search of the trunk

somehow exceeded the scope of consent to search, the court disagrees. When asked for

permission to search the vehicle, Defendant gave general consent without any "explicit limitation

on the scope of the search." *See United States v. Wacker*, 72 F.3d 1453, 1470 (10th Cir. 1995)

(citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). Accordingly, Trooper Withers was

"justified in searching the entire vehicle[,]" including the trunk.[7] *See id.* (citing, *inter alia*, *United States v. Deases*, 918 F.2d 118, 122 (10th Cir. 1990)); *United States v. Olivas*, 351 F. Supp. 2d 1180, 1187 (D. Kan. 2004) (holding that search of defendant's trunk did not exceed scope of consent where defendant's consent did not explicitly limit the search to the passenger compartment and defendant did not object when the search extended to the trunk). Further, there is no indication from the record before the court that Defendant thereafter "object[ed] to or express[ed] any concern about the officer's activities," nor did he "attempt[] to limit or retract his consent." *Pena*, 920 F.2d at 1515. And, as explained above, the record suggests he had sufficient opportunity to do so. "A defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication that the search was within the scope of consent." *United States v. Jackson*, 381 F.3d 984, 988 (10th Cir. 2004) Accordingly, the court concludes that the search of the trunk was within the original scope of consent and rejects Defendant's contrary arguments.

## CONCLUSION

Based on the foregoing, the court concludes that Defendant's Motion to Suppress (Docket No. 32) must be **DENIED**.

IT IS SO ORDERED.

Signed this 3rd day of May, 2017.

BY THE COURT

---

[7] Additionally, the court notes that Trooper Withers asked for permission to search the vehicle directly after a series of questions regarding the presence of specific drugs in the car. This further suggests that Defendant's subsequent unqualified consent contemplated a search for drugs in the entire car, including any areas that might reasonably contain drugs. *See Gallardo*, 495 F.3d at 989–90 (finding that an officer's multiple questions about the presence of drugs before a request to search "left no doubt that illegal drugs would be the object of [the] search"); *Wacker*, 72 F.3d at 1470 (holding that the scope of defendant's consent to search for drugs or contraband included the bed of his truck in the absence of explicit limitations or subsequent modification of consent); *Untied States v. Ramstad*, 308 F.3d 1139, 1146–47 (10th Cir. 2002) (holding that consent to search for drugs or contraband "certainly implies that the officer could look wherever drugs might be hidden").

Jill N. Parrish
United States District Court Judge